## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DONALD DEMPSTER, SR., derivatively on behalf of HONEYWELL INTERNATIONAL INC.,<br><br>          Plaintiff,<br><br>   v.<br><br>DARIUS E. ADAMCZYK, DUNCAN B. ANGOVE, WILLIAM S. AYER, KEVIN BURKE, D. SCOTT DAVIS, LINNET F. DEILY, JUDD A. GREGG, CLIVE R. HOLLICK, GRACE D. LIEBLEIN, JAIME CHICO PARDO, GEORGE PAZ, ROBIN L. WASHINGTON, DAVID M. COTE, GREGORY P. LEWIS, and THOMAS A. SZLOSEK,<br><br>          Defendants,<br><br>  -and-<br><br>HONEYWELL INTERNATIONAL INC.,<br><br>          Nominal Defendant. | Civil Action No. _____<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND CONTRIBUTION FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff Donald Dempster, Sr. ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Contribution for Violations of Federal Securities Laws. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to the Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things: (a) review and analysis of regulatory

filings made by Honeywell International Inc. ("Honeywell" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Honeywell; (c) review of other publicly available information concerning Honeywell; and (d) the allegations, and the court's denial of the defendants' motion to dismiss, in the pending securities fraud class action styled *Kanefsky v. Honeywell International Inc., et al.*, No. 2:18-cv-15536-WJM-JAD (D.N.J.) (the "Securities Class Action").

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a stockholder derivative action brought by the Plaintiff on behalf of nominal defendant Honeywell against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and contribution for violations of federal securities laws from February 9, 2018 through October 19, 2018, inclusive (the "Relevant Period").  These wrongs resulted in tens of millions of dollars in damages to Honeywell's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Honeywell to tens of millions in potential liability for violations of the federal securities laws.

2.       Honeywell is a multinational conglomerate that manufactures a variety of commercial and consumer products, engineering services, and aerospace systems.

3.       In 1999, Honeywell acquired Bendix Friction Materials ("Bendix"), a manufacturer of automotive, truck, and industrial brakes.  Despite longstanding known health hazards, for a number of years Bendix used asbestos in its brake and clutch-pad products.  This improper and continued use of asbestos exposed individuals that performed or were in the vicinity of individuals that performed brake replacements.  Thousands of these individuals sued Honeywell for millions of dollars each.  As a result, Honeywell now faces enormous liabilities related to asbestos exposure from Bendix's products.  For example, in January 2019, after a three week trial in Arkansas, a jury

held Honeywell accountable and awarded more than $18.5 million to the family of a man that worked at a brake shop in the 1970s, and was exposed to asbestos in brake-shoe linings.

4.     Despite facing this massive liability, Honeywell significantly understated the Company's potential asbestos-related liability attributable to Bendix as a result of the misapplication of applicable accounting rules.  Investors began to learn the truth about the extent of this liability on August 23, 2018, when the Company filed a Current Report on Form 8-K with the SEC before the market opened.  The Form 8-K disclosed that after being confronted by the SEC, Honeywell had no choice but to revise its accounting treatment of the appropriate accruals for Bendix asbestos-related liability for unasserted claims in accordance with Accounting Standards Codification 450, Contingencies ("ASC 450").  As a result of this change, liabilities were estimated to be "**$1,083 million higher** than the Company's prior estimation," an increase of **177%** from the estimated liability that Honeywell had disclosed just five weeks earlier in its Quarterly Report on Form 10-Q, filed on July 20, 2018, and repeated in prior SEC filings made in 2018.

5.     Further, as a direct result of this unlawful course of conduct, Honeywell is now the subject of a consolidated federal securities class action lawsuit filed in this district on behalf of investors who purchased Honeywell's shares.  The complaint alleges the Company and certain of its current and former directors and officers violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") based upon many of the same or similar facts and allegations detailed herein.  On May 18, 2020, U.S. District Court Judge William J. Martini denied defendants' motion to dismiss in the Securities Class Action.  The court held, among other things, that the plaintiff in the Securitie Class s Action sufficient pled that Honeywell choose a truncated amount of time to assess its Bendix liabilities because the Company knew if it did otherwise it

would significantly increase Honeywell's liabilities. The court also held that the plaintiff adequately pled that defendants in the Securities Class Action made the materially false statements with scienter, meaning "a mental state embracing intent to deceive, manipulate, or defraud."

6.     The Plaintiff, after serving his demand letter, received confidential documents from the Company pursuant to 8 *Del. C.* § 220 relating to the misconduct complained of herein. Following review of such documents, the Plaintiff served a joint litigation demand with another stockholder (the "Litigation Demand") on the Honeywell Board of Directors (the "Board") on April 21, 2020. *See* Exhibit A hereto. By letter dated June 8, 2020, the Board wrongfully rejected Plaintiff's Litigation Demand. *See* Exhibit B hereto.

7.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

8.     Jurisdiction is conferred by 28 U.S.C. §1331. The claims asserted herein arise under section 21D of the Exchange Act. This Court has exclusive subject matter jurisdiction over the federal securities laws claims under section 27 of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.

9.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is incorporated in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because: (i) Honeywell conducts business in and is incorporated in this District; (ii) a substantial portion of the

transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Honeywell, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

11.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have

## PARTIES

12.    Plaintiff was a stockholder of Honeywell at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is current Honeywell stockholders.

13.    Nominal Defendant Honeywell is a multinational conglomerate that produces a wide range of consumer and industrial products, engineering technology, and aerospace systems. Honeywell is incorporated under Delaware law.  During the Relevant Period, Honeywell's principal executive offices were located at 115 Tabor Road, Morris Plains, New Jersey 07950. Honeywell's common stock is traded on the NYSE under the symbol "HON".

14.    Defendant Darius E. Adamczyk ("Adamczyk") has been the Chief Executive Officer ("CEO") of Honeywell since March 2017 and Chairman since April 2018.  Defendant Adamczyk was President from April 2017 to April 2018 and Chief Operating Officer from April 2016 to March 2017.  Upon information and belief, Adamczyk is a citizen of North Carolina. Defendant Adamczyk was awarded the following compensation in 2018:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | SEC Total Compensation | Non-SEC Total Annual Compensation |
|------|--------|--------------|---------------|----------------------------------------|------------------------------------------------------------------------|------------------------|------------------------|-----------------------------------|
| 2018 | $1,571,154 | $9,561,215 | $3,185,655 | $4,100,000 | $595,082 | $233,498 | $19,246,604 | $18,418,024 |

15.     Defendant Duncan B. Angove ("Angove") has been a member of the Board since February 2018.  Upon information and belief, defendant Angove is a citizen of Georgia.  Defendant Angove was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $173,434 | $50,116 | $50,314 | $4 | $273,868 |

16.     Defendant William S. Ayer ("Ayer") has been a member of the Board since December 2014.   Upon information and belief, defendant Ayer is a citizen of Washington. Defendant Ayer was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $180,000 | $50,116 | $50,314 | $25,004 | $305,434 |

17.     Defendant Kevin Burke ("Burke") has been a member of the Board since January 2010.  Defendant Burke served on the Audit Committee at all relevant times.  Upon information and belief, defendant Burke is a citizen of Florida.  Defendant Burke was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $185,000 | $50,116 | $50,314 | $25,004 | $310,434 |

18.     Defendant D. Scott Davis ("Davis") has been a member of the Board since 2006. Defendant Davis served on the Audit Committee at all relevant times.  Upon information and belief, defendant Davis is a citizen of Georgia.  Defendant Davis was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $205,000 | $50,116 | $50,314 | $10,319 | $1,991 | $317,740 |

19.     Defendant Linnet F. Deily ("Deily") has been a member of the Board since April 2006.  Defendant Deily served on the Audit Committee at all relevant times.  Upon information and belief, defendant Deily is a citizen of Texas.  Defendant Deily was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $205,000 | $50,116 | $50,314 | $30,035 | $335,465 |

20.     Defendant Judd A. Gregg ("Gregg") has been a member of the Board since April 2011.  Defendant Gregg served on the Audit Committee at all relevant times.  Upon information and belief, defendant Gregg is a citizen of New Hampshire.  Defendant Gregg was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $185,000 | $50,116 | $50,314 | $25,004 | $310,434 |

21.     Defendant Clive R. Hollick ("Hollick") has been a member of the Board since 2004. Upon information and belief, defendant Hollick is a citizen of the United Kingdom.  Defendant Hollick was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $180,000 | $50,116 | $50,314 | $11,399 | $45,339 | $337,168 |

22.     Defendant Grace D. Lieblein ("Lieblein") has been a member of the Board since December 2012.  Upon information and belief, defendant Lieblein is a citizen of Michigan. Defendant Lieblein was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $180,000 | $50,116 | $50,314 | $15,227 | $295,657 |

23.     Defendant Jaime Chico Pardo ("Pardo") was a member of the Board from December 1999 until April 2020, and was the Lead Director at all relevant times.  Defendant Pardo was a member ex officio of the Audit Committee at all relevant times.  Upon information and belief, defendant Pardo is a citizen of Mexico.  Defendant Pardo was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $215,000 | $50,116 | $50,314 | $27,335 | $342,765 |

24.     Defendant George Paz ("Paz") has been a member of the Board since December 2008.  Defendant Paz chaired the Audit Committee at all relevant times.  Upon information and belief, defendant Paz is a citizen of Missouri.  Defendant Paz was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $205,000 | $50,116 | $50,314 | $25,004 | $330,434 |

25.     Defendant Robin L. Washington ("Washington") has been a member of the Board since April 2013.  Defendant Washington served on the Audit Committee at all relevant times.  Upon information and belief, defendant Washington is a citizen of California.  Defendant Washington was awarded the following compensation in 2018:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $194,287 | $50,116 | $50,314 | $4 | $294,721 |

26.     Defendant David M. Cote ("Cote") was Honeywell's CEO until March 2017 and Executive Chairman until April 2018.  Upon information and belief, defendant Cote is a citizen of Florida.  Defendant Cote was awarded the following compensation in 2017:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | SEC Total Compensation |
|---|---|---|---|---|---|---|
| 2017 | $900,962 | $9,990,000 | $8,645,000 | $788,013 | $631,564 | $20,955,539 |

27.     Defendant Gregory P. Lewis ("Lewis") has been Honeywell's Chief Financial Officer ("CFO") since August 2018.  Before that, defendant Lewis was the Company's Vice President of Corporate Finance, with responsibility for Treasury, Tax, Audit, Business Analysis and Planning, Investor Relations, M&A, Real Estate, Pension, Finance Operations, and Enterprise Information Management beginning in May 2018.  Upon information and belief, defendant Lewis is a citizen of North Carolina.  Defendant Lewis was awarded the following compensation in 2018:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | SEC Total Compensation | Non-SEC Total Annual Compensation^ |
|---|---|---|---|---|---|---|---|---|
| 2018 | $578,981 | $554,742 | $591,250 | $730,000 | $103,155 | $48,365 | $2,606,493 | $2,454,973 |

28.     Defendant Thomas A. Szlosek ("Szlosek") was Honeywell's CFO at all relevant times until August 3, 2018.  Upon information and belief, defendant Szlosek is a citizen of New Jersey.  Defendant Szlosek was awarded the following compensation in 2018:

| Year | Salary | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | SEC Total Compensation |
|---|---|---|---|---|---|---|
| 2018 | $560,481 | $4,050,122 | $1,348,050 | $229,616 | $15,135 | $6,203,404 |

29.     Defendants Adamczyk, Angove, Ayer, Burke, Davis, Deily, Gregg, Hollick, Lieblein, Pardo, Paz, Washington, Cote, Lewis, and Szlosek are collectively referred to as the "Individual Defendants."  By reason of their positions as officers and directors of the Company,

each of the Individual Defendants owed and owe Honeywell and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Honeywell in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Honeywell and not in furtherance of their personal interest or benefit.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

30.     To discharge their duties, the officers and directors of Honeywell were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Honeywell were required to, among other things:

(a)     accurately guide the Company's stockholders and the public when speaking about the Company's results of operations, liabilities, and financial condition;

(b)     ensure that Honeywell operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations, including the federal securities laws;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how Honeywell conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

31.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Honeywell, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

**Breaches of Duty**

32.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Honeywell, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

33.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to disseminate information that failed to disclose to investors that their SEC filings in the first half of 2018 concealed material information from investors about Honeywell's Bendix-related asbestos liabilities.

34.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Honeywell, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Honeywell has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

35.     In addition to these duties, under its Charter in effect since February 28, 2017, the "Audit Committee Defendants," namely defendants Burke, Davis, Deily, Gregg, Pardo, Paz, and

Washington, owed specific duties to Honeywell to "provide assistance to the Board of Directors in fulfilling its responsibilities relating to oversight of (i) the Company's accounting and financial reporting practices and internal control system, (ii) the independent auditor's qualifications and independence, (iii) the performance of the Company's internal audit function and independent auditor, and (iv) compliance with legal and regulatory requirements."   Moreover the Audit Committee's Charter provides the Audit Committee is responsible for assisting the Board's oversight of:

(a)     the integrity of Honeywell's financial statements and Honeywell's accounting and financial reporting processes and systems of internal control over financial reporting and safeguarding Company assets;

(b)     Honeywell's compliance with legal and regulatory requirements;

(c)     Honeywell's independent auditors' retention, termination, qualifications, independence, and performance;

(d)     the performance of Honeywell's internal auditors and internal audit function;

(e)     Honeywell's financial matters and financial strategy; and

(f)     Honeywell's guidelines and policies with respect to risk assessment and risk management.

36.     In addition, the Audit Committee Charter provides:

**Audit Committee Charter**
(Approved by the Board on 9/27/19)

The Committee shall review this Charter on an annual basis and recommend any changes to the Board for approval.

**I. Composition**

The Committee shall be composed of three or more members of the Board of Directors who meet the requirements established for audit committee members under the listing standards and rules of the New York Stock Exchange and the Securities and Exchange Commission. At least one member of the Committee shall satisfy the financial expertise requirements set forth in such listing standards and rules.

The members of the Committee shall be elected by the Board at the recommendation of the Corporate Governance and Responsibility Committee. If an Audit Committee Chair is not designated or present, the members may designate a Chair by majority vote.

## II. Meetings

The Committee shall meet at least eight times each fiscal year. The Committee shall meet with management, and shall meet periodically with the chief internal auditor and the independent auditors in separate executive sessions.

## III. Purpose

The Committee shall provide assistance to the Board of Directors in fulfilling its responsibilities relating to oversight of (i) the Company's accounting and financial reporting practices and internal control system, (ii) the independent auditor's qualifications and independence, (iii) the performance of the Company's internal audit function and independent auditor, and (iv) compliance with legal and regulatory requirements.

The Company's management is responsible for preparing the Company's financial statements and the independent auditors are responsible for auditing those financial statements. The Committee is responsible for overseeing the conduct of these activities by the Company's management and the independent auditors.

## IV. Responsibilities

The following shall be the primary activities of the Committee in carrying out its oversight responsibilities. The Committee may, from time to time, alter its procedures as appropriate given the circumstances and shall perform such other functions as may be assigned to it by law, the Company's charter, the By-laws or by the Board.

1. Review the results of each external audit of the Company's financial statements, including any certification, report, opinion or review rendered by the independent auditor in connection with the financial statements, and ensure that the independent auditor has full access to the Committee during its performance of the audits to report on any and all appropriate matters.

2. Review other matters related to the conduct of the audit which are communicated to the Committee under generally accepted auditing standards and rules of the

Securities and Exchange Commission.

3. Based on the review under 1 and 2 above, the Committee will advise the Board of Directors whether it recommends that the audited financial statements be included in the Company's Annual Report on Form 10-K and prepare the Committee report to be included in the Company's proxy statement in accordance with Securities and Exchange Commission rules.

4. Review with management and the independent auditors, prior to the filing thereof, the Company's annual and interim financial results (including Management's Discussion and Analysis) to be included in Forms 10-K and 10-Q, respectively, and the matters required to be communicated to the Audit Committee under generally accepted auditing standards and rules of the Securities and Exchange Commission. The Chair of the Committee may represent the entire Committee for purposes of the interim review.

5. Appoint, and recommend to the shareowners for approval, the firm to be engaged as the Company's independent auditor, which firm shall report directly to the Committee. The Committee shall be directly responsible for the compensation, retention and oversight of the independent auditor, including the resolution of disagreements between management and the independent auditor regarding financial reporting. The Committee shall have the sole authority to approve all audit engagement fees and terms.

6. Review and discuss earnings releases, guidance releases and presentations to be made public in connection with such releases, including the types of financial information to be disclosed in connection with such disclosures.

7. Evaluate at least annually the independent auditor's performance and, if appropriate, recommend its discharge.

8. Receive at least annually the written disclosures and the letter from the independent auditor required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent auditor's communications with the Committee concerning independence. The Committee shall discuss with the auditor the scope of any disclosed relationships and their impact or potential impact on the auditor's independence and objectivity, and recommend that the full Board take appropriate action to satisfy itself of the auditor's independence.

9. Review at least annually reports by the independent auditor describing the auditor's internal quality control procedures, material issues raised by its most recent internal quality control (or peer) review, all relationships between the auditor and the Company, and any audit problems or difficulties and management's response.

10. Approve all non-audit engagements with the independent auditor, either through express prior review and approval or through the adoption of policies and procedures for engaging the independent auditor to perform services other than

audit, review and attest services. Between regularly-scheduled meetings of the Committee, the Chair of the Committee may represent the entire Committee for purposes of the review and approval of the terms of non-audit engagements with the independent auditor.

11. Review, with management and the independent auditor, the Company's internal control over financial reporting, including management's annual assessment of the adequacy and effectiveness of internal control over financial reporting, any significant deficiencies or material weaknesses in internal controls (including the remediation thereof), any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting, and any changes in internal controls that have materially affected or are likely to materially affect internal control over financial reporting. The foregoing shall include review of reports of the independent auditor and the chief internal auditor related to the adequacy of the Company's internal accounting controls, including any management letters and management's responses to recommendations made by the independent auditor or the chief internal auditor.

12. Review, with appropriate members of senior management, the Company's disclosure controls and procedures, including management's conclusions about the effectiveness thereof and any material non-compliance therewith, and any audit steps adopted in light of any such non-compliance.

13. Review, in consultation with the independent auditor and the chief internal auditor, the scope and plan of forthcoming external and internal audits (including areas to be examined, the adequacy of personnel to be assigned to the audits, other factors that may affect the audit timeline, and audit procedures), the involvement of the internal auditors in the audit examination, and the independent auditor's responsibility under generally accepted auditing standards.

14. Oversee the Company's policies with respect to risk assessment and risk management, including the Company's risk assessment policies, major financial risks and enterprise exposures, and steps taken to monitor, control and respond to such exposures.

15. As appropriate, obtain advice and assistance from outside legal, accounting or other advisors.

16. Review, approve and thereby establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Review at least quarterly the Company's significant accounting, internal control and other integrity and compliance investigations.

17. Review material legal and compliance matters involving the Company periodically with the Company's Senior Vice President and General Counsel and

the Vice President – Global Compliance, it being understood that each such individual has express authority to communicate personally with the Chair of the Audit Committee about any such matter as appropriate.

18. Monitor and provide risk oversight with respect to focus areas as may be assigned to the Committee from time to time by the Board of Directors, including cybersecurity, tax and liquidity management, product integrity and product security, vendor risk, operational business continuity, and crisis management.

19. Review, approve and thereby establish clear hiring policies regarding employees or former employees of the independent auditor.

20. Review succession planning for the Company's finance and accounting function, including the appointment and replacement of the Company's chief internal auditor.

21. The Committee shall have the power to inquire into any financial matters not set forth above, and shall perform such other functions as may be assigned to it by law, or the Company's charter or By-laws, or by the Board.

22. Undertake an annual performance evaluation of the activities of the Committee, including the Committee's charter and its responsibilities as set forth above.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties

38.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Honeywell, regarding Honeywell's Bendix-related asbestos liabilities; and (ii) enhance the Individual Defendants' executive and directorial positions at Honeywell and the profits, power, and prestige that the Individual Defendants enjoyed as a result

of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

39.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

40.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**Background on Honeywell's Asbestos Liability**

43.     Honeywell is a multinational conglomerate that produces a wide range of consumer and industrial products, engineering technology, and aerospace systems.

44.     Asbestos is toxic to human beings and results in a range of known effects, from asymptomatic scarring of the lungs (pleural plaques) to functionally limiting disease, including asbestosis and fatal cancers of the lining of the chest, heart, abdomen and lungs.  Asbestosis and lung cancer are generally related to the quantum of exposure and are found among workers. Mesothelioma is a cancer primarily of the pleura and peritoneum and can result from only trivial exposure and, thus, affects both workers and the general population, often presenting decades following exposure

45.     Honeywell is a defendant in asbestos-related personal injury actions related to two predecessor companies, North American Refractories Company ("NARCO"), which was sold in 1986, and Bendix, which was sold in 2014.

46.     NARCO produced refractory products (bricks and cement used in high temperature applications).  Claimants from NARCO asbestos liabilities consist largely of individuals who allege exposure to NARCO asbestos-containing refractory products in an occupational setting. Rather than the traditional tort system, NARCO claims are processed through a Trust established under federal bankruptcy laws.  The model used for determining how much money was placed in this Trust was based on a fifteen-year time horizon because, as Honeywell explains, "it represented our best estimate of the time period it would take for the Trust to be approved by the Bankruptcy Court, become fully operational and generate sufficiently reliable claims data … to enable us to update our NARCO Trust asbestos accrual, including by potentially applying a different time

horizon to the projection." The Trust became operational in 2013; there was no claims data available to Honeywell before that time.

47.     Bendix manufactured automotive brake parts that contained chrysotile asbestos in an encapsulated form. Despite known health hazards, Bendix used asbestos in its brake- and clutch-pad products until 2001. Claimants of Bendix asbestos liabilities consist largely of individuals who allege exposure to asbestos from brakes from either performing or being in the vicinity of individuals who performed brake replacements. Unlike with NARCO, the Bendix claims are processed through the traditional tort system.

48.     Although Honeywell sold Bendix in 2014, Honeywell has been sued in tens of thousands of cases alleging exposure to asbestos from Bendix products, and between Honeywell and its insurance companies, over $1 billion has been spent to resolve the claims. Despite having far more claims data than was available for the NARCO Trust, Honeywell only used a five-year time horizon, rather than the fifteen-year time horizon used for NARCO, to estimate its Bendix-related asbestos liabilities in early 2018.

**Honeywell Misleads the Market Regarding Its Asbestos Liability**

49.     Honeywell filed its Annual Report on Form 10-K for 2017 on February 9, 2018 (the "2017 10-K"). Defendants Adamczyk, Cote, Gregg, Hollick, Ayer, Lieblein, Burke, Paz, Pardo, Davis, Washington, Deily, and Szlosek signed the 2017 10-K. Honeywell stated its estimation of the Bendix-related asbestos liabilities was $616 million. This figure only included an estimated value of the claims to be asserted over a five-year time horizon, and therefore was a gross underestimation of the Company's true Bendix-related asbestos liabilities. Honeywell continued to use this five-year time horizon method of calculating the Bendix-related asbestos.

50.     The 2017 10-K contained a series of "Notes" to its consolidated financial statements.  Note 19, titled "Commitments and Contingencies," discussed the Company's asbestos-related liabilities.  In Note 19, Honeywell provided a chart showing that its total Bendix-related asbestos liabilities were $616 million as of December 31, 2017:

**Asbestos Related Liabilities**

| | Year Ended December 31, 2017 | | | Year Ended December 31, 2016 | | | Year Ended December 31, 2015 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Bendix | NARCO | Total | Bendix | NARCO | Total | Bendix | NARCO | Total |
| Beginning of year | $ 641 | $919 | $1,560 | $ 622 | $921 | $1,543 | $ 623 | $929 | $1,552 |
| Accrual for update to estimated liability | 199 | 31 | 230 | 203 | 9 | 212 | 180 | 8 | 188 |
| Change in estimated cost of future claims | (4) | — | (4) | 13 | — | 13 | 11 | — | 11 |
| Update of expected resolution values for pending claims | 3 | — | 3 | 4 | — | 4 | 1 | — | 1 |
| Asbestos related liability payments | (223) | (43) | (266) | (201) | (11) | (212) | (193) | (16) | (209) |
| End of year | $ 616 | $907 | $1,523 | $ 641 | $919 | $1,560 | $ 622 | $921 | $1,543 |

51.     This representation was false and materially misleading because Honeywell's true Bendix-related asbestos liabilities as of December 31, 2017 was $1.703 billion, nearly three times more than the amount represented.  The representation was also materially false and/or misleading because it stated that Honeywell was complying with generally accepted accounting principles ("GAAP") and various accounting standards, namely ASC 450, in calculating this figure.  It was not.  Honeywell was, in fact, not adhering to ASC 450 or, for that matter, industry norms.  Instead of estimating its Bendix-related asbestos liabilities to account for the full term of the epidemiological studies, Honeywell was cutting off its estimates after five years, thus disregarding any potential for liability from that point forward.  There was no conceptual basis for limiting this ASC 450 assessment.  Honeywell provided its $616 million estimate without any warning that the estimate was unsupported by, contrary to, and in violation of applicable accounting standards.  This was not a matter of opinion, but instead a direct and intentional violation of generally accepted accounting principles.

52.     In Note 19, Honeywell also provided investors with a description of its method for determining the Company's Bendix-related asbestos liabilities.  In pertinent part, the 2017 10-K stated:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. ***In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.*** The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

(Emphasis added).

53.     This statement was materially false and misleading.  Honeywell knew that it was able to "estimat[e] asbestos claims beyond the next five years," but intentionally decided not to do so.  Honeywell's decision to restate its asbestos liability estimates on August 23, 2018, proves this point and confirms the Company had the information necessary to provide the correct financial information throughout the Relevant Period.  Thus, Honeywell, Adamczyk, and Szlosek lied when they told investors the Company did not have the ability to estimate Bendix- related liabilities for a period greater than five years in the future.

54.     The 2017 10-K also indicates that Honeywell had net income of $1.655 billion attributed to Honeywell and comprehensive income of $2.177 billion.  However, unbeknownst to investors this number was false and misleading as Honeywell had actually inflated its net income

by 6.5% and comprehensive income by 5% by limiting asbestos liability to just five years.  In other words, had Honeywell properly accounted for its $1.703 billion of Bendix-related asbestos liabilities, the Company's net income and comprehensive income would have been decreased by 6.5% and 5%, respectively.

55.     In connection with Honeywell's 2017 10-K, defendants Adamczyk and Szlosek each certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they reviewed the 2017 10-K.  Specifically, Adamczyk and Szlosek each certified that:

1.     I have reviewed this Annual Report on Form 10-K of Honeywell International Inc.

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) **designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles**;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

**(a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

**(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Emphasis added).

56.      Defendants Adamczyk and Szlosek's certifications were materially false and/or misleading for three reasons.  First, the certifications falsely represented that the financial statements within the 2017 10-K "fairly present[ed] in all material respects the financial condition … of the registrant as of, and for, the periods presented in this report."  This was not true.  As discussed above, Honeywell's true Bendix-related asbestos liabilities as of December 31, 2017 was $1.703 billion, nearly three times more than the amount represented.

57.      Second, the certifications falsely represented that Honeywell's internal controls over financial reporting were designed to ensure the Company's financial statements within the 2017 10-K were in conformance with generally accepted accounting principles.  This was not true.

As discussed above, Honeywell and its senior management (including defendants Adamczyk and Szlosek) had implemented and maintained an internal control that allowed the Company to inappropriately rely on limited objective and verifiable data in order to use a five-year horizon when estimating Bendix-related asbestos liabilities.  In turn, the control allowed Honeywell to under-report its liability based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon.  This was not in conformance with GAAP.  Accordingly, Honeywell's internal controls over financial reporting were not designed to ensure compliance with GAAP principles.

58.     Third, although defendants Adamczyk and Szlosek represented in their certifications that they had disclosed all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, they in fact had not.  As discussed above, defendants Adamczyk and Szlosek were responsible for the implementation and maintenance of an internal control that violated GAAP and, in turn, allowed Honeywell to materially under- report its Bendix-related asbestos liabilities.  Defendants Adamczyk and Szlosek had not disclosed this significant deficiency and/or material weakness and, as a result, their certifications were materially false and misleading.

59.     The omissions and/or misrepresentations in the 2017 10-K and the accompanying certifications were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

60.     Honeywell repeated that disclosure and included five years of expected Bendix liabilities in its Quarterly Reports on Form 10-Q for the first and second quarter of 2018, filed on April 20, 2018 and July 20, 2018 respectively.

61.     On April 20, 2018, Honeywell filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the first quarter of 2018 (the "Q1 2018 10-Q").  Jennifer H. Mak signed the Q1 2018 10-Q on behalf of Honeywell.

62.     The Q1 2018 10-Q contained a series of "Notes" to its consolidated financial statements.  Note 14, titled "Commitments and Contingencies," discussed the Company's asbestos-related liabilities.  In a table under Note 14, Honeywell represented that its total Bendix-related asbestos liabilities were $616 million as of December 31, 2017, and $615 million as of March 31, 2018:

**Asbestos Related Liabilities**

|  | Bendix | NARCO | Total |
|---|---|---|---|
| December 31, 2017 | $    616 | $    907 | $    1,523 |
| Accrual for update to estimated liability | 47 | 8 | 55 |
| Asbestos related liability payments | (48) | (2) | (50) |
| March 31, 2018 | $    615 | $    913 | $    1,528 |

63.     This representation was false and materially misleading because Honeywell's true Bendix-related asbestos liabilities as of December 31, 2017 were actually $1.703 billion, nearly three times more than the amount represented.

64.     The Q1 2018 10-Q also repeated the false disclosure contained in the 2017 10-K that "[i]n light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years."

65.     In connection with Honeywell's Q1 2018 10-Q, defendants Adamczyk and Szlosek each certified pursuant to SOX that they reviewed the Q1 2018 10-Q.

66.     On July 20, 2018, Honeywell filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the second quarter of 2018 (the "Q2 2018 10-Q").  John J. Tus ("Tus") signed the Q2 2018 10-Q on behalf of Honeywell.

67.     The Q2 2018 10-Q contained a series of "Notes" to its consolidated financial statements.  Note 15, titled "Commitments and Contingencies," discussed the Company's asbestos-related liabilities.  Within Note 15, Honeywell represented that its total Bendix-related asbestos liabilities were $616 million as of December 31, 2017, and $610 million as of June 30, 2018:

**Asbestos Related Liabilities**

|  | Bendix | NARCO | Total |
|---|---|---|---|
| December 31, 2017 | $   616 | $   907 | $   1,523 |
| Accrual for update to estimated liability | 92 | 19 | 111 |
| Asbestos related liability payments | (98) | (8) | (106) |
| June 30, 2018 | $   610 | $   918 | $   1,528 |

68.     As described above, this representation was materially false and/or misleading because Honeywell's true Bendix-related asbestos liabilities were $1.703 billion as of December 31, 2017, nearly three times more than the amount represented.

69.     The Q2 2018 10-Q also repeated the false disclosure contained in the 2017 10-K that "[i]n light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years."

70.     In connection with Honeywell's Q2 2018 10-Q, defendants Adamczyk and Szlosek each certified pursuant to SOX that they reviewed the Q2 2018 10-Q.

**The Individual Defendants Knew or Should Have Known the Asbestos-Related Statements Were False**

71.     Under ASC 450, Honeywell is required to account for and provide disclosures related to loss contingencies, including its estimated liability stemming from litigation.  ASC 450, the authoritative accounting standard under U.S. generally accepted accounting principles concerning loss contingencies, provides that a company must accrue for a loss when that loss is both probable and reasonably estimable.  *See* ASC 450-20-25-2.  If a loss is reasonably possible, but not probable, and is reasonably estimable, then ASC 450-20-50-3 directs that a company

disclose that contingent loss but not record an accrual.  ASC 450-20 makes clear that the same standards for accrual and disclosure of contingent liabilities apply to both unasserted claims as well as asserted claims.  Specifically, ASC 450-20-55-14 provides, "[w]ith respect to unasserted claims and assessments, an entity must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome.... If an unfavorable outcome is probable and the amount of loss can be reasonably estimated, accrual of a loss is required by paragraph 450-20-25-2."

72.     Prior to August 2018, Honeywell accounted for Bendix related asbestos liabilities for a limited five-year horizon.  As Honeywell would later admit, this accounting policy did not comply with the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims.  This is because Honeywell possessed data that could yield a probable and reasonably estimable projection of liability under ASC 450 for the full term of the epidemiological projections beyond just five years.

73.     Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical claims information on which to rely when estimating a future projection of liability.  Each year, Honeywell has a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support reliable estimates.  For Bendix, historical claims data is readily available on a real-time basis through its day-to-day experience in the tort system.  The robustness of this data supports the conclusion that application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450.

74.     Historically, Honeywell's accounting process for recognition of the Bendix asbestos liability begins with notification of claims being asserted against Honeywell via outside counsel

which also serves as the Bendix claims administrator. It continues with the processing of the claim and case resolution (either dismissal or settlement), the processing of any applicable settlement payments, the accounting for claims filings, dismissals and payment, the insurance recovery process, and ends with the related financial reporting and financial statement disclosures.

75.     In addition to a liability for pending claims (claims filed in the tort system against Honeywell as of the financial statement date), Honeywell assesses the potential liability from unasserted claims (claims expected to be filed against Honeywell in future periods). The pending claims balance, including data on claim filings, settlements and dismissals, are reported to Honeywell on a monthly basis by its claims administrator.

76.     The amount of the pending claims liability is calculated monthly by Honeywell representing a product of the pending claims balances by disease category multiplied by the average resolution values by disease category. The average resolution values by disease category are based on actual settlements and dismissals by disease category for the previous five years. These average resolution values are monitored by Honeywell quarterly and updated in the fourth quarter of each year.

77.     Honeywell utilizes a third-party specialist to determine its liability for unasserted claims based on the following: epidemiological projections of the future incidence of disease; historical claims rate experience by disease category in the tort system; and historical resolution values (settlements and dismissals) by disease category.

78.     The liability for unasserted claims is updated by the third-party specialist in the fourth quarter each year based on the factors described above. The historical claims information is provided to the third-party specialist by the third-party claims administrator.

79.     As such, Honeywell's estimated value of Bendix related liabilities included future anticipated claims based on historical claims filing experience and dismissal rates, disease classifications, and average resolution values in the tort system for the previous five years.

80.     In addition to historical data, Honeywell, its third-party specialists, and its outside legal counsel considered emerging trends and discoveries.

81.     According to Honeywell's August 20, 2018 letter to the SEC, described more fully below, "[s]ignificant weight was placed on the emerging science and studies that indicated the nature and application of the asbestos used in manufactured automotive brake parts by Bendix does not cause disease. Management also focused on evidence suggesting improvements in the tort system with regards to the resolution of asbestos claims (this information and insights having been provided to management by outside counsel)."  Due to the evolving nature of these trends, Honeywell claimed it could not determine a probable and reasonably estimable future liability beyond five years in the future.

82.     However, this claim was incorrect, as the wealth of historical data available to Honeywell and its third-party specialist allowed it to later estimate future liabilities out to the year 2059.  By only presenting the liabilities for a five-year horizon, Honeywell, by its own admission, "did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence."

**Honeywell's Misstatements Are Uncovered by the SEC**

83.     On the morning of August 23, 2018, Honeywell filed an Item 7.01 disclosure on Current Report on Form 8-K with the SEC revealing that it had revised its method for estimating its liability for unasserted Bendix-related asbestos claims by considering the epidemiological projections through 2059 instead of the previous five-year time horizon.

84.     The August 23, 2018 Form 8-K states in pertinent part:

During the course of the Securities and Exchange Commission (SEC) review of the Form 10 filing for the planned spin-off of its Transportation Systems business, Garrett Motion Inc. ("Garrett"), Honeywell International Inc. ("Honeywell", the "Company" or "We") has been engaged in discussions with the staff of the SEC (the "Staff") regarding Garrett's accounting for its liability for unasserted Bendix-related asbestos claims and, in conjunction therewith, reviewed the accounting treatment of its legacy Bendix asbestos liabilities. The Staff's comments related to Garrett's accounting in this area are also applicable to Honeywell's historical financial statements.

Following these discussions, ***the Company revised its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims in accordance with Accounting Standards Codification 450, Contingencies ("ASC 450").*** The prior accounting treatment, disclosed in our footnotes to our historical financial statements, applied a five-year time horizon; the revised treatment ***reflects the full term of epidemiological projections through 2059.*** The change was made in consideration of a number of factors, ***including the subjective nature of applying a five-year or any other fixed time horizon when estimating liability for unasserted claims, recent changes by several other registrants to accrue for unasserted asbestos claims over the full term of the epidemiological projections and the desire to facilitate comparability among Honeywell, Garrett and their respective peers***.

Our consolidated balance sheets, consolidated statements of operations, consolidated statements of comprehensive income, consolidated statements of shareholders' equity, and consolidated statements of cash flows relative to prior periods will be immaterially revised to correct the Company's application of ASC 450 with respect to Bendix related-asbestos liabilities.

(Emphasis added).

85.     Attached to the August 23, 2018 Form 8-K as Exhibit 99 were restated consolidated balance sheets that showed the impact of the change in accounting methodology. These tables indicated an additional $1.083 billion in asbestos-related liabilities for the quarter ended June 30, 2018 and an additional $1.087 billion in asbestos-related liabilities for the year ended December 31, 2017.

**Asbestos Related Liabilities**

| | Bendix | | |
| | *(in millions)* | | |
| | As Reported | Adjustment | As Revised |
| --- | --- | --- | --- |
| December 31, 2017 | $      616 | $      1,087 | $      1,703 |
| Accrual for update to estimated liability | 92 | (4) | 88 |
| Asbestos related liability payments | (98) | – | (98) |
| June 30, 2018 | $      610 | $      1,083 | $      1,693 |

86.     The August 23, 2018 Form 8-K Exhibit 99 states:

**Asbestos Matters**

The Company has revised its method for reasonably estimating its liability for unasserted Bendix asbestos-related claims by considering the epidemiological projections through 2059 of future incidence of Bendix asbestos-related disease. Using this method, ***the Company's Bendix asbestos-related liability is estimated to be $1,693 million as of June 30, 2018***. This is ***$1,083 million higher than the Company's prior estimation*** which applied a five-year horizon when estimating the liability for unasserted Bendix asbestos-related claims.

(Emphasis added).

87.     As a result, the Company's prior reported financials underestimated its asbestos liabilities attributable to Bendix by over $1 billion.  Additionally, Honeywell disclosed that net income attributable to Honeywell for 2017 was actually $1.545 billion, not the previously reported $1.655 billion.  This equated to a 14-cent reduction in the earnings per share ("EPS") of common stock, from $2.14 to $2.

| | Years Ended December 31, | | | | |
| | *(Dollars in millions, except per share amounts)* | | | | |
| | 2017 | 2016 | 2015 | 2014 | 2013 |
| --- | --- | --- | --- | --- | --- |
| **As Reported** | | | | | |
| Net income attributable to Honeywell | $ 1,655 | $ 4,809 | $ 4,768 | $ 4,239 | $ 3,924 |
| Earnings per share of common stock—basic | $ 2.17 | $ 6.29 | $ 6.11 | $ 5.40 | $ 4.99 |
| Earnings per share of common stock—assuming dilution | $ 2.14 | $ 6.20 | $ 6.04 | $ 5.33 | $ 4.92 |
| **As Revised** | | | | | |
| Net income attributable to Honeywell | $ 1,545 | $ 4,812 | $ 4,771 | $ 4,262 | $ 3,922 |
| Earnings per share of common stock—basic | $ 2.03 | $ 6.30 | $ 6.12 | $ 5.43 | $ 4.99 |
| Earnings per share of common stock—assuming dilution | $ 2.00 | $ 6.21 | $ 6.04 | $ 5.36 | $ 4.92 |

88.     The above information partially revealed that: (1) Honeywell had been improperly accounting for Bendix's asbestos-related liabilities; (2) Honeywell's true Bendix-related asbestos liabilities was significantly greater than previously represented; (3) that Honeywell could in fact estimate Bendix-related asbestos liabilities for periods greater than five years in the future, contrary to what Honeywell previously told investors; (4) that Honeywell's previous accounting methodology was contrary to, and in violation of, ASC 450; and (5) that Honeywell's internal controls over financial accounting and public disclosures were not designed and/or working properly, as claimed by defendants Adamczyk and Szlosek in their certifications pursuant to the SOX.

89.     On the same day, on August 23, 2018, Honeywell issued a press release and held a conference call with investors announcing the impact of two spinoffs, Garrett Motion Inc. ("Garrett") and Resideo Technologies, Inc. ("Resideo"), on Honeywell stockholders.  The press release revealed ostensibly favorable news, including the following: "Garrett and Resideo will make payments to Honeywell under separate indemnification and reimbursement agreements that largely offset Honeywell's related legacy liability spending, including the Bendix asbestos liability that arises from the operations of the legacy Transportation Systems business."  In a presentation that accompanied the investor call, Honeywell further clarified that Garrett would cover 90% of Honeywell's annual Bendix asbestos spending, up to a limit of $175 million a year.  This agreement would terminate after either: (1) the payments over a three-year period fell below $25 million annually; or (2) on December 31, 2048, whichever came first.  Defendants did not explain or reconcile their previous position that they could only estimate the liabilities for a five-year time horizon with the 30-year term for the indemnification agreement.

90.     Even though the truth about Honeywell's massive asbestos-related liabilities began to be revealed in the August 23, 2018 Form 8-K, the simultaneously announced news about the indemnification agreement assuaged analysts and investors.  The stock price remained steady, opening on August 23, 2018 at $151.30 per share and closing at $151.35 per share, unadjusted.

91.     Had it not been for the accounting disclosures, the good news about the indemnification and an additional announcement that management raised the full year EPS guidance by $0.05 would have buoyed the stock price much higher.

92.     Despite the disclosures in the August 23, 2018 Form 8-K, Honeywell continued to conceal the truth from investors.  Neither the Form 8-K nor the accompanying exhibit fully disclosed: (1) management's involvement in and responsibility for estimating Bendix-related asbestos liabilities; (2) that the accounting process and controls for estimating Bendix-related asbestos liabilities involved an intentional decision to ignore liabilities potentially arising more than five years into the future; or (3) that defendants knew that the accounting process used for estimating Bendix-related asbestos liabilities was in violation of ASC 450, GAAP and industry norms.  Moreover, Honeywell did not disclose, but instead concealed, that its decision to change its accounting processes for Bendix liabilities was brought about by communications with the SEC's Division of Corporation Finance beginning in May 2018.

93.     On October 10, 2018, the SEC made public correspondence between its Division of Corporation Finance and Honeywell dated August 14, 2018 and August 20, 2018.  On October 10, 2018, the letters were listed chronologically on the SEC's website under the dates they were sent, August 14 and August 20.  This caused them to appear lower than that of Honeywell's more recent filings on the list of documents returned when conducting an online search for the Company.  In its letter dated August 14, 2018, the SEC stated, in pertinent part:

We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO- related asbestos liability. In your response, also please provide us with an *analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods*. To the extent you determine that the specific future time periods used were incorrect, please provide us with a materiality analysis and your assessment of whether there was a material weakness in internal controls over financial reporting.

We remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff.

(Emphasis added).

94.     On August 20, 2018, Tus, Honeywell's former Vice President and Controller, responded to the SEC via letter.  Each page of the letter was marked "Confidential treatment Requested by Honeywell International, Inc."  In the August 20, 2018 letter, Tus stated:

As described in more detail below and in the Appendices hereto, *we are proposing to change our accounting treatment for Bendix asbestos-related liabilities to a terminal value time horizon.* We also discuss our materiality analysis related to that revision and our conclusion that the revision we intend to make does not indicate a material weakness in our internal control over financial reporting.

*       *       *

*Upon thorough consideration of the Staff's comments* in its review of the Form 10 submitted to the Staff in connection with the proposed spin-off of Garrett Motion Inc. and of the application of ASC 450, *Honeywell determined that we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims*. Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability. The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of liability for unasserted Bendix-related asbestos claims.

It is important to note that, unlike the NARCO Trust, Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical claims information on which to rely when estimating a future projection of liability.

Each year, we have a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support reliable estimates. ***The robustness of this data supported our conclusion that application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450***.

(Emphasis added).

95.      The above statements revealed to the market that Honeywell's previous statements regarding accounting for the Bendix-related asbestos liabilities were materially false and misleading.  Contrary to Honeywell's previous statements that "we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years," this letter revealed Honeywell did in fact have data to support accounting for the full term.  This statement also revealed that Honeywell had been discussing this matter with the SEC since its review of Garrett's Form 10, months before Honeywell disclosed their new accounting practice.

96.      Incorporated to Honeywell's letter to the SEC was Appendix A that contained additional disclosures relating to Honeywell's prior improper accounting.  Appendix A states:

Additionally, management has evaluated the circumstances around the Bendix asbestos liability error detailed above to determine whether it is an indicator of a material weakness in financial reporting controls. Based on the quantitative and qualitative considerations discussed below ***we concluded we have a significant deficiency and not a material weakness in internal controls over financial reporting related to our determination of the time horizon for the Bendix-related asbestos liability.***

(Emphasis added).

97.      This letter revealed to the market that Honeywell had a significant deficiency it its internal controls over financial reporting and as a result, the accounting for Bendix-related asbestos liabilities, as well as defendants' SOX certifications were materially false and misleading.

98.      Appendix A continued, discussing the accounting error and the effect it had on net income and comprehensive income, stating:

- Under the iron curtain method, the effects of a cumulative correction on the Company's projected 2018 income statement, however, would be material. For instance, the impact of correcting the error in 2018 would be a charge of **(i) $1,018 million to income before taxes, and (ii) $770 million to net income. This would represent a greater than 10% impact on both of the forecasted 2018 amounts. Accordingly, we have concluded that the error cannot be corrected through the 2018 income statement and must, therefore be corrected via a revision of prior periods**.

- In order to assess whether the revision for this error represents a material restatement or immaterial restatement (i.e. revision), we utilized the rollover method to quantify the amount by which each affected income statement and statement of cash flows in the last five years was actually misstated, and quarterly periods for the latest two years. Additionally, as part of this analysis, we calculated the cumulative effect of the uncorrected error on the balance sheets at the end of each such period. The rollover method analysis indicates that the restatement is not quantitatively material because the effects of the error on the misstated income statements, statements of cash flows and balance sheets of those prior periods is **less than 5% of all key metrics in each period, with the exception of net income (- 6.5%) and comprehensive income (- 5.0%) for the year ended December 31, 2017.**

(Emphasis added).

99.     This statement revealed to the market that Honeywell would have to issue a restatement for Bendix-related asbestos liabilities, and the negative affect it would have on net income and comprehensive income.  This revealed that the prior numbers relating to Bendix's asbestos-related liabilities and net income disseminated by Honeywell were in fact, materially false and misleading.

100.     Appendix A then discussed exactly how long Honeywell could estimate its liabilities for, and the factors used to decide to correct the error.

As indicated previously, in August 2018, ***management concluded it should adjust the Bendix asbestos liability to reflect the full term of the epidemiological projections through 2059, and therefore, determined that it had historically incorrectly applied the provisions of ASC 450***, Contingencies, in measuring its Bendix asbestos liability related to unasserted claims. This error, and the related control deficiency, were identified during the course of the SEC Staff's review of the Form 10 filing related to Garrett Motion Inc.

Our conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), (ii) *noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies (again because of such time horizon subjectivity), and (iii) concluding that such an adjustment would facilitate comparability between Honeywell, Garrett Motion Inc., and the companies' respective peers*. Therefore, with the assistance of an external specialist, and utilizing a model with actuarial inputs, Honeywell has and will continue in the future to consider the full term of epidemiological projections of future incidents of asbestos-related disease to estimate its probable and reasonably estimable Bendix asbestos- related liability.

(Emphasis added).

101.    This statement revealed to the market that Honeywell should have been recording Bendix's asbestos-related liabilities out to 2059, not just a five-year horizon as it had done historically.  This demonstrated that Honeywell's prior statement that Honeywell did not have a reasonable basis for estimating asbestos claims beyond the next five years, was materially false and misleading.

102.    Appendix A also identified the control that was deficient and the root cause for the deficiency.  Specifically, Appendix A states:

*Control Identified*

*The error that was identified is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted.*

As noted in the summary of the accounting process for unasserted claims above, we use a third-party specialist to assist in assessing the required Bendix unasserted claims liability. The Company has designed a relevant internal control over that process. *We identified an operating effectiveness deficiency related to that internal control activity*. The specific control activity is the "Bendix Reserves True-up" control, which states that "…Honeywell's third-party service provider calculates the average resolution values on which Honeywell bases its estimates of the total liability associated with its current and future Bendix asbestos claims. The year-end reserve is updated based on the new average resolution values and is approved by Management." This key control is specific to Bendix-related asbestos

reserves where, on an annual basis, the Bendix-related asbestos reserves are adjusted to properly reflect current year estimates regarding both resolution values and estimated future claimants based on anticipated changes in the population of claims. Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions. ***Management has historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims***. Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

*   *   *

*Nature and Root Cause*

*   *   *

[I]n connection with the performance of this control, the Company inappropriately relied on ***limited objective and verifiable data to justify its use of a five- year horizon***. The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. ***The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence.***

(Emphasis added).

103.    The above information revealed the extent of the control weakness and the fact that Honeywell ignored information when determining the horizon for Bendix's asbestos-related liabilities.  This showed that the prior statements that Honeywell did not have a reasonable basis for estimating asbestos claims beyond the next five years, as well as Defendants' SOX certification were materially false and misleading.

104.    Appendix A also informed investors that Honeywell had the information needed to determine the deficiency at an earlier point.  Specifically, Appendix A states:

***We concluded it was appropriate to revise prior periods when correcting the error under SAB 99***. This consideration implies that ***there was information available***

***that should have caused us to modify the time horizon used for the Bendix unasserted claims liability at an earlier point.*** The specific time horizon is subjective in nature given the assessment of all available information.

(Emphasis added).

105.    This statement again revealed to the market that the error was so severe that it would result in a restatement.  This revealed that the prior numbers relating to Bendix's asbestos-related liabilities and net income disseminated by Honeywell were, in fact, materially false and misleading.

106.    This also informed investors that Honeywell had the information to find the error well before Honeywell decided to review or disclose it.  This shows the extent of Honeywell's internal weakness, and that its previous SOX certification were materially false and misleading.

107.    Appendix A also determined that defendants' prior SOX certifications were materially false and/or misleading. Specifically, Appendix A states:

**SOX 404 Assessment Conclusion**

Based on the considerations above, we concluded that there was not a material weakness in internal control. However, we determined that the deficiency is important enough to merit the attention of those responsible for oversight of the Company's financial reporting and internal controls, and therefore ***Management concluded that a significant deficiency in internal controls over financial reporting existed***. Specifically, the identified Bendix asbestos control did not operate effectively because the Company inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. We did not consider all available evidence to evaluate whether we should apply the full term of the epidemiological studies. The Company focused too heavily on the emerging science and studies that indicated the nature and application of the asbestos used at Bendix does not cause disease, and on evidence of improvements in the tort system with regards to resolution of asbestos claims.

(Emphasis added).

108.    This correspondence revealed to the market that Honeywell's previous SOX certifications were in fact false due to a significant deficiency internal controls over financial reporting.

109.     Despite the admissions and revelations contained in Honeywell's August 20, 2018 correspondence with the SEC, it still misled investors by attempting to portray Honeywell's conduct in a nonculpable light.  Moreover, given the manner in which the correspondence was released, many investors were unaware of defendants' admissions or that it had engaged in an intentional violation of GAAP standards when providing the public with estimates of its Bendix-related asbestos liabilities.

110.     Before the market opened on October 10, 2018, Honeywell issued a press release revealing that Resideo would be spun-off on October 29, 2018, earlier than previously expected, and announcing a flash Investor Showcase and Technology Demonstration.  Later that day Honeywell held the conference and announced sales growth in each of the business segments that would become part of the Resideo spin-off.  New management also assuaged investor fears about competition from other retailers, such as Amazon Alexa and Home Depot, and announced plans to expand in high-growth areas like China and India.

111.     Resideo's indemnification agreement with Honeywell was discussed at length on the call.  Joseph Ragan, Resideo's new Executive Vice President and CFO, explained that the liability was capped at $140 million per year, that it was a 25-year arrangement, and that Resideo had already modeled the liability into their numbers.  In the question and answer portion of the call, Michael G. Nefkens again clarified that the liability could be as much as $140 million per year.  Dean Acosta, Chief Communications Officer for the new spin-off, also jumped in to clarify "[w]e don't manage the remediation.  All of that's done by Honeywell."

112.     Just as before on August 23, 2018, the subsequent analyst reports focused on the positive news Honeywell strategically announced on the same day the SEC published its correspondence questioning Honeywell's accounting practices.

113.    The stock price declined, from an opening market price of $155.76 on October 10, 2018 to an unadjusted closing price of $148.86 per share on October 11, 2018.

114.    In addition, on October 31, 2018, Honeywell was sued by an investor in the U.S. District Court for the District Court of New Jersey.  The action alleges that the defendants made false and misleading statements concerning Honeywell's accounting for Bendix related asbestos claims.  On May 18, 2020, the court denied the motion to dismiss, holding that the plaintiff adequately alleged that the defendants made false and misleading statement with scienter.

115.    In denying the motion to dismiss in the Securities Class Action, the District Court summarized the key admissions made by Honeywell in the August 20 letter:

> At the same time, Honeywell made several key admissions ("Admissions"), including: (1) it "had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities"; (2) "the appropriate application of ASC 450 … is to reflect the full term of the epidemiological projections in the measurement of such liability"; (3) Honeywell "had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon"; and (4) "[t]he Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon." While Honeywell stressed that it used third-parties to help assess Bendix liabilities, it also stated that "Management" (5) "reviews the specialist report ... and discusses with the specialist the significant actuarial inputs"; (6) "has historically ... held discussions with the specialist regarding the time horizon used"; and (7) "approves any adjustment to the unasserted claims liability amount." Finally, (8) the revision "implies that there was information available that should have caused [Honeywell] to modify the time horizon used for the Bendix unasserted claims liability at an earlier point".

*Kanefsky v. Honeywell Int'l, Inc.*, No. 18-cv-15536, 2020 U.S. Dist. LEXIS 87108, at *6-7 (D.N.J. May 18, 2020) (citations omitted) (alterations and omissions in original).

## DAMAGES TO HONEYWELL

116.    As a result of the Individual Defendants' improprieties, Honeywell and the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about Honeywell's asbestos-related liabilities.  As a result of the

above, defendants' public statements were materially false and/or misleading at all relevant times. Indeed, actions by Honeywell's fiduciaries have devastated the Company, as evidenced by the nearly 4.6% stock drop between October 9, 2018 and October 11, 2018, which erased approximately $5 billion of the Company's market capitalization, and the 6.4% stock drop between October 18, 2018 and October 24, 2018, which wiped out nearly $6.7 billion of the Company's market capitalization.

117.   Honeywell's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, the Company's current and potential investors consider a company's trustworthiness, stability, and ability to evaluate known risks. Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and regulations, and are uncertain about their own financial condition.  Accordingly, the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, Honeywell stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

118.   Further, as a direct and proximate result of the Individual Defendants' actions, Honeywell has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred from investigations, including responding to the SEC and any fines;

(b)   costs incurred from the Company's internal investigation into its accounting practices and policies;

(c)      costs incurred from revisiting and restating previous financial reports;

(d)      costs incurred from restoring the value of its impaired brands and trademarks;

(e)      costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

(f)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to Honeywell.

## DERIVATIVE ALLEGATIONS

119.   Plaintiff brings this action derivatively in the right and for the benefit of Honeywell to redress injuries suffered, and to be suffered, by Honeywell as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and contribution for violations of federal securities laws, as well as the aiding and abetting thereof, by the Individual Defendants. Honeywell is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.   The Plaintiff will adequately and fairly represent the interests of Honeywell in enforcing and prosecuting its rights.

121.   Plaintiff was a stockholder of Honeywell at the time of the wrongdoing complained of, have continuously been a stockholder since that time, and are current Honeywell stockholders.

122.   On April 21, 2020, the Plaintiff jointly served his Litigation Demand on the Board. The Litigation Demand, among other things, demanded that the Board take all necessary steps to investigate, address, and promptly remedy the harm inflicted upon Honeywell as a result of the misconduct described herein.  In particular, Plaintiff demanded that the Board investigate the circumstances surrounding Honeywell's false and misleading statements and violations of any applicable laws, rules, and regulations.  In addition, Plaintiff demands that the Board investigate

any other violations of applicable laws, rules, and regulations.  In addition, Plaintiff demanded that the Company "following its investigation, commence legal proceedings against each party responsible for the mismanagement and other related misconduct" described above.

123.     By letter dated June 8, 2020 from defendant Adamczyk, the Chairman of the Board, the Board constructively refused Plaintiff's Litigation Demand.  In a cursory, three-page letter, the Board concluded that "[i]t is not presently in the best interests of the Company to undertake the demanded investigation, as doing so would be premature, would be prejudicial to the Company's ability to respond effectively to, and defend itself in, the Securities Class Action, has the potential to harm the Company, and has the potential to be an inefficient and wasteful use of the Company's resources."  The letter contained no information to support these conclusory statements, such as how investigating whether the Company was still employing wrongdoers in the positions of control would undermine the defense in the Securities Class Action.

124.     The Board added that, purportedly, "the Board is not rejecting or refusing the Demand… The Board may take any of the Demanded Actions or other actions in the future, if warranted in light of future developments."  However, the Board cannot shirk its duties to Plaintiff and other stockholders by attempting to hold Plaintiff's Litigation Demand in abeyance indefinitely.  By declining to timely investigate Plaintiff's demands, including the commencement of appropriate litigation against culpable insiders, the Board has wrongfully refused the Litigation Demand.

125.     Further, the Board's response letter makes it clear that no serious investigation has been undertaken in response to Plaintiff's Litigation Demand.  While the Board has purportedly "met to discuss the [Litigation] Demand[,]" there is no indication that the Board gave the demand any serious consideration.  There is no indication that the Board, for example, formed any

committees for the purpose of investigating Plaintiff's demand.  Moreover, it is not clear whether the Board even discussed the Litigation Demand on more than one occasion.  Rather, the Board appears to have based its decision not to pursue the Litigation Demand entirely on investigatory work performed prior to the date of the demand.  Accordingly, the Board's constructive refusal was uninformed and wrongful.

126.    Moreover, the unreasonableness of the Board's refusal is further underscored by the May 18, 2020 decision in the Securities Class Action denying defendants' motion to dismiss.  The Board's refusal letter to Plaintiff concedes that "[t]he claims asserted in the Securities Class Action are based on the same alleged statements, omissions, and/or conduct described in the [Litigation] Demand."  Accordingly, the Board's refusal to take up Plaintiff's demanded investigation is at odds with the May 18 findings of the District Court that similar allegations are actionable at the pleading stage, and that Honeywell will be forced to expend additional company resources litigating and resolving the Securities Class Action.

127.    Plaintiff has not made any demand on the other stockholders of Honeywell to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Honeywell is a publicly held company with over 700 million shares outstanding and thousands of stockholders as of June 30, 2020;

(b)    making demand on such a number of stockholders would be impossible for the plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force the plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (AGAINST THE INDIVIDUAL DEFENDANTS)

128.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

129.    The Individual Defendants owed and owe Honeywell fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Honeywell the highest obligation of good faith, fair dealing, loyalty, and due care.  These duties included an obligation of which the Individual Defendants were fully aware, to manage Honeywell's business and affairs in accordance with all laws applicable to the Company's operations, including the federal securities laws, rules, and regulations.

130.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Honeywell, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

131.    The Individual Defendants breached their duty of loyalty by purposefully knowingly, or recklessly failing to implement and maintain an adequate system of internal controls.  Specifically, the Individual Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly causing or allowing the Company to violate federal securities laws, and allowing the Company to suffer needless losses by failing to implement and maintain an adequate system of internal controls to ensure the Company's public statements were truthful and disclosed any fraud or any material weakness in internal controls over financial reporting.

132.     In addition, the Individual Defendants breached their fiduciary duties of loyalty by making or allowing the Company to make improper statements in the Company's publicly disseminated documents and SEC filings concerning Honeywell's asbestos-related liabilities.

133.     The Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.

134.     The Individual Defendants, as directors of the Company, owed Honeywell the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity and improper statements detailed herein.  The Individual Defendants knew or were reckless in not knowing that Honeywell misstated its asbestos-related liabilities in its SEC filings.  Accordingly, these defendants breached their duty of loyalty to the Company.

135.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein that were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

136.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Honeywell has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

137.     Plaintiff, on behalf of Honeywell, has no adequate remedy at law.

## COUNT II

### WASTE OF CORPORATE ASSETS
### (AGAINST THE INDIVIDUAL DEFENDANTS)

138.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

139.    As a result of the Individual Defendants' failure to maintain adequate internal controls to over financial reporting, these fiduciaries have caused Honeywell to waste its corporate assets by forcing the Company to expend valuable resources to investigating its financial statements.

140.    In addition, as a result of the defendants' misrepresentation and concealment of material facts, the Company is now subject to various securities class actions.  The Individual Defendants have caused the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

141.    The Individual Defendants have caused Honeywell to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

142.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

143.    Plaintiff, on behalf of Honeywell, have adequate remedy at law.

## COUNT III

### UNJUST ENRICHMENT
### (AGAINST THE INDIVIDUAL DEFENDANTS)

144.    Plaintiff repeats and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Honeywell.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Honeywell.

146.     Plaintiff, as a stockholder and representative of Honeywell, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

147.     Plaintiff, on behalf of Honeywell, has no adequate remedy at law

## COUNT IV

### VIOLATIONS OF SECTIONS 10(B) AND 21D OF THE EXCHANGE ACT
### (AGAINST DEFENDANTS STITZEL, HARRIS, POTESHMAN, AND O'LEARY
### CONTRIBUTION)

148.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149.     Defendants Adamcyzk, Szlosek, and Lewis are named as defendants in a related securities class action.  The conduct of these defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

150.     Honeywell is named as a defendant in related securities class actions that allege and assert claims arising under section 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.  If Honeywell is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some

of the defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

151.    As officers, directors, and otherwise, defendants Adamcyzk, Szlosek, and Lewis had the power or ability to, and did, control or influence, either directly or indirectly, Honeywell's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5.

152.    Defendants Adamcyzk, Szlosek, and Lewis are liable under section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

153.    Defendants Adamcyzk, Szlosek, and Lewis have damaged the Company and are liable to the Company for contribution.

154.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT V

### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT
### (AGAINST THE INDIVIDUAL DEFENDANTS)

155.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156.    During the Relevant Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the relevant period, did: (i) deceive the investing public as alleged herein; and (ii) cause investors to purchase Honeywell's securities at artificially

inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each defendant, took the actions set forth herein.

157.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Honeywell's securities in violation of section 10(b) of the Exchange Act and Rule 10b-5.   All Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

158.    The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Honeywell's financial well-being and prospects, as specified herein.

159.    The Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Honeywell's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Honeywell and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business

which operated as a fraud and deceit upon the purchasers of the Company's securities during the Relevant Period.

160.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Relevant Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

161.   The Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Honeywell's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Relevant Period, defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing

to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

162.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Honeywell's securities was artificially inflated during the Relevant Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Relevant Period investors acquired Honeywell's securities during the Relevant Period at artificially high prices and were damaged thereby.

163.    At the time of said misrepresentations and/or omissions, investors were ignorant of their falsity and believed them to be true.  Had investors known the truth regarding the problems that Honeywell was experiencing, which were not disclosed by defendants, investors would not have purchased or otherwise acquired their Honeywell securities, or, if they had acquired such securities during the Relevant Period, they would not have done so at the artificially inflated prices which they paid.

164.    By virtue of the foregoing, defendants violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

165.    As a direct and proximate result of defendants' wrongful conduct, class members suffered damages in connection with their respective purchases and sales of the Company's securities during the Relevant Period.

## COUNT VI

### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
### (AGAINST THE INDIVIDUAL DEFENDANTS)

166.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

167.     Individual Defendants acted as controlling persons of Honeywell within the

meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions and their ownership and contractual rights, participation in, and/or awareness of the

Company's operations and intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Individual Defendants had the

power to influence and control and did influence and control, directly or indirectly, the decision-

making of the Company, including the content and dissemination of the various statements which

investors contend are false and misleading.  Individual Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings, and other

statements alleged by investors to be misleading prior to and/or shortly after these statements were

issued and had the ability to prevent the issuance of the statements or cause the statements to be

corrected.

168.     In particular, Individual Defendants had direct and supervisory involvement in the

day-to-day operations of the Company and, therefore, had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the

same.

169.     As set forth above, Honeywell and Individual Defendants each violated section

10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

position as controlling persons, Individual Defendants are liable pursuant to section 20(a) of the

Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, investors suffered damages in connection with their purchases of the Company's securities during the Relevant Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Honeywell, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and contribution for violations of federal securities law;

B.     Directing Honeywell to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Honeywell and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies;

1.     a proposal to strengthen the Company's controls over financial reporting;

2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.     a provision to permit the stockholders of Honeywell to nominate at least three candidates for election to the Board; and

4.     proposal to strengthen Honeywell's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, an state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that the plaintiff on behalf of Honeywell have an effective remedy;

D.      Awarding to Honeywell restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Finding that Plaintiff's Litigation Demand was wrongfully refused;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 2, 2020                                    **COOCH AND TAYLOR, P.A.**

                                                         */s/ Blake A. Bennett*
                                                         Blake A. Bennett (#5133)
                                                         The Nemours Building
                                                         1007 N. Orange Street, Suite 1120
                                                         Wilmington, DE 19801
                                                         Telephone: (302) 984-3800
                                                         Facsimile: (302) 984-3939
**OF COUNSEL**                                           E-mail: bbennett@coochtaylor.com

**ROBBINS LLP**                                          *Attorneys for Plaintiff*
Brian J Robbins
Craig W. Smith
Shane P. Sanders
Emily R. Bishop
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com

ssanders@robbinsllp.com
ebishop@robbinsllp.com